Springfield Marine Bank, Appellant, v. Benjamin F. Marbold et al., Appellees.

Gen. No. 8,530.

448

Opinion filed November 4, 1931. Rehearing denied and opinion modified and refiled February 12, 1932.

FRANK E. BLANE and HOFF & HOFF, for appellant; ALONZO HOFF and LAWRENCE HOFF, of counsel.

A. M. FITZGERALD and EDW. H. GOLDEN, for appellees.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Menard county, dismissing for want of equity appellant's bill to foreclose a certain mortgage held by it. A decree was entered after a hearing upon a master's report of evidence, the cause having been referred to the master to take evidence and report the same without his conclusions.

The bill of complaint charges that on March 9, 1927, Benjamin F. Marbold and wife, being indebted to one Joseph C. Bernard in the sum of $45,000, made and delivered their note for $45,000, together with six interest or coupon notes, to secure the payment of which they at the same time, by their mortgage deed, conveyed the premises in question; that on March 14, 1927, the said mortgage and notes were duly assigned to the complainant; that said Benjamin F. Marbold and wife have not paid the said $45,000 or any of the interest notes and in accordance with the terms of said mortgage the complainant has elected to declare the entire mortgage indebtedness due and to foreclose said mortgage. The bill also asks for the appointment of a receiver, as provided by the mortgage, and that the premises be sold, etc.

The answer of the defendant Benjamin F. Marbold admits the execution of the mortgage and notes and the subsequent assignment thereof to the complainant;

admits that the mortgage provided for a receiver and foreclosure proceedings, and that the $45,000 and interest has not been paid, but denies the complainant has the right to foreclose said mortgage but has forfeited any rights it may have acquired by virtue of said mortgage deed. It further charges that the said Marbold was not indebted to said Joseph C. Bernard but that the latter was merely the agent of the complainant and the mortgage here in question was given for the sole purpose of securing a prior indebtedness of $100,000 owed the complainant. It further alleged that the mortgage in question was executed upon the representation that the complainant would co-operate with said Marbold in forming a trust for the benefit of all of his creditors of which he had a great number, and that if all of his creditors would join in said trust agreement the complainant would release its mortgage and share pro rata with the other creditors; that Henry E. Pond, by virtue of a trust agreement entered into March 23, 1927, with said Marbold, became vested in all of said Marbold's property; that said Henry E. Pond entered into the execution of said trust and that all of said Marbold's creditors, including complainant, acquiesced in said trust agreement; that the complainant has therefore waived its rights under said mortgage deed and is estopped from maintaining its bill for foreclosure.

The answer of Henry E. Pond as trustee is virtually the same as that of the defendant Marbold, so far as the issues presented are concerned.

The appellant filed a general replication to both answers.

The evidence reported by the master disclosed the following facts: Appellee B. F. Marbold, who lived at Greenview in Menard county, was president and ran the Marbold State Bank of Greenview and was also possessed of large real estate holdings consisting of

some 2,630 acres of farm land and also some city property located in the counties of Menard, Sangamon, Mason and Logan. On March 7, 1927, the Marbold State Bank was closed by the auditor of public accounts of the State of Illinois, and it became apparent that Marbold's affairs were in an involved condition. Sometime prior to this date Marbold had become indebted to the appellant, Springfield Marine Bank, in the amount of $100,000, which sum was for money loaned him upon his unsecured notes. For a considerable time prior to the closing of the Marbold State Bank, Marbold had had an application pending with one Joseph C. Bernard for a loan upon the property involved; and it was the understanding that the appellant was either, to be paid or to receive mortgages as security, but the loan was not made until two days after the failure of the Marbold State Bank or on March 9, 1927, and when finally made was made at appellant's request. At that time the mortgage in question for $45,000 and another for $55,000 were given by Marbold and wife to Bernard and later, on March 14, 1927, were assigned to the appellant. At the time these mortgages were executed a verbal agreement was entered into between J. H. Holbrook, vice president of the appellant bank, and B. F. Marbold that the appellant would co-operate with Marbold in forming a trust for the benefit of his creditors, and that if Marbold was successful in forming this trust and if all his creditors joined in it without preference in approximately 90 days, then the Marine Bank would release its mortgages and share pro rata with the other creditors.

Pursuant to this agreement and with the help of appellant, on March 23, 1927, a trust agreement was entered into between Marbold and appellee Henry E. Pond, who was made trustee of all of Marbold's property for the benefit of his creditors. This agreement, which is appellee Pond's Exhibit 1, among other things

provided that Pond was to apply the money received by him in liquidating Marbold's affairs: ". . . pro rata and without preference to each and every creditor of the said first party who shall within ninety days after the execution and delivery of these presents file with the said second party a statement, duly verified by affidavit, of the debt due and owing by said first party, and who shall within ninety days after the execution and delivery of these presents, agree in writing to accept the terms and conditions thereof, or within such time as may be granted."

On March 31, 1927, Pond held a meeting of Marbold's creditors at Greenview, at which meeting and with the approval of the complainant Pond told the creditors that if all of the creditors would come in under the agreement, that they (Springfield Marine Bank) would waive their mortgages and that the Marbold State Bank would waive its preference under its mortgage and share pro rata with the common creditors.

At this meeting a number of the creditors signed the trust agreement. The part of the instrument signed by the creditors provided:

"For value received and on account of each other agreeing to a composition of settlement of indebtedness the undersigned hereby consent and agree to the appointment of Henry E. Pond as a Trustee by Benjamin F. Marbold, for the purpose of converting his property, real, personal and mixed, into money for distribution to his creditors . . . and we agree that we will accept our pro rata part of assets as a compromise in full to be distributed by such trust agreement hereto attached. . . ."

It further provided that Mrs. Marbold was to receive 25 per cent in lieu of dower, and contained a covenant not to sue the debtor or his estate.

The witness Holbrook was vice president of and represented appellant, the Springfield Marine Bank, in all of these proceedings. There is a sharp conflict in

the testimony given between the statements of the witness Holbrook and appellee Pond, trustee. It was shown that at the time of the giving of these mortgages and before, Marbold had conversations with Holbrook in which Holbrook agreed with him that if the creditors would sign up and enter into a trusteeship agreement without preference, that the bank would join. Upon these conditions the mortgage was made. Holbrook testified: "He (Marbold) did not want to get into trouble with his other creditors and he wanted it; he was afraid that they would precipitate trouble." Holbrook was here referring to the execution of the mortgages in question. "On those conditions he made the mortgages." Those conditions as stated by Holbrook in full are as follows: "He spoke of trusteeship, that he thought of making a trusteeship and asked us if we would go in on that trusteeship if he made it and release the mortgages. We told him that if everyone would sign and everyone would enter into it without preference, that we would join in the agreement provided it was done in a reasonable length of time, approximately ninety days. Those were the conditions we laid down as to whether or not we would join in that trusteeship, and that is the agreement made with Mr. Marbold and on those conditions he made the mortgages." At that time Holbrook knew of the trouble at the bank.

Following the execution of the two mortgages for the appellant, various efforts were made to secure a trustee to whom all of Marbold's property would be transferred,—one who would be satisfactory to the creditors. Little progress was made. E. B. Waldmire made such an effort and failed. After his failure Waldmire called upon Henry E. Pond, appellee, and requested him to go to Springfield and confer with officers of the appellant bank. This he did. Pond called at appellant's bank and Holbrook, its vice president,

stated to him that the thing to do to effect a fair settlement of the indebtedness of Mr. Marbold was to consummate a trust, and Pond complained that appellant already had a preference in the shape of the two mortgages and Holbrook replied: "If we get a trust agreement signed by all creditors the Marine Bank would waive their apparent preference under those two mortgages and come in and share with the creditors pro rata." As a result of the conferences had by Pond with representatives of the Marine Bank, the trust agreement was prepared by the attorney and officers of the Springfield Marine Bank. Prior to its execution no one, so far as the evidence shows, but the Marine Bank, through its officers and attorneys, B. F. Marbold and his wife and their attorney, Judge F. E. Blane, and the defendant Pond, had seen or approved this trust agreement. None of the creditors had seen it. Mr. Hoff drew up the trust agreement. He is one of the attorneys for the Springfield Marine Bank and also a director of that bank. No statement or charge for the preparation of the trust agreement was ever rendered by Hoff to Pond. The trust agreement was dated March 23, 1927.

Following the execution of the trust agreement deeds were executed and delivered by Marbold and his wife conveying his real property to the defendant Pond.

On March 31, 1927, a first meeting of the creditors of Marbold was held. Notice had been sent out to the creditors by Pond. At that meeting Pond advised the creditors that if they would sign up and agree to the trust agreement which had been prepared and would permit him to handle the property for the best interests of all of the creditors, upon a pro rata basis, that the Marine Bank would also abide by such agreement and participate pro rata with them, and would waive any preference under these mortgages. He further

stated that he had authority from Holbrook, vice president of the Marine Bank, to make this statement.

Many of the creditors signed up, but not all, and a second meeting was called for April 12, 1927. In substance the same assurances were given to those attending the second meeting which had been given at the first meeting.

Prior to the time of the execution of the trust agreement and the conferences which were held between Pond and officers of the Marine Bank, there had been general knowledge of B. F. Marbold's financial troubles, and it was known that the Marine Bank had the mortgage sued upon, and the first mortgage of $55,000. Creditors prior to the first meeting of March 31 had interviewed their attorneys with reference to instituting involuntary bankruptcy proceedings against B. F. Marbold. At the time of Pond's conference with Holbrook about the preparation and execution of the trust agreement between Marbold and Pond, Pond told Holbrook that there was danger of immediate application for involuntary bankruptcy by creditors of B. F. Marbold and also of attachment proceedings. The possibility of bankruptcy proceedings against Marbold was discussed at the first meeting of creditors.

Between the first meeting with Holbrook and the meeting of the creditors on April 12, Pond had five or six conferences with different officers of the Marine Bank, who understood just what he was doing.

At the second meeting, which was held at the time specified in notices sent to the creditors, additional creditors signed the written agreement, but not all of them, and on April 15, five or six had not joined. Pond then took this agreement to Holbrook together with the signatures. He told Holbrook that it looked like he could not get all of the creditors to sign; that he knew of some, whose names he mentioned, who would not sign. He fully discussed the situation with

reference to those who had signed, naming names and giving reasons for those who had not signed and exhibited frankly to Holbrook all that had been done prior thereto. Pond testified that he asked Holbrook what he should do in view of the facts and that Holbrook said, after studying quite awhile, "Go ahead, there is nothing else to do." Pond further testified that in substance Holbrook said that the bank will go along with you. In this meeting with Holbrook, Holbrook said nothing to Pond about abandoning the trust plan because he had not been able and would not be able to have all of the creditors sign the trust agreement. Holbrook's version of this conversation was that he said the only thing for him to do was to do all he could to get the signatures in before the time limit was up.

Following this meeting with Holbrook, Pond conferred with Holbrook in regard to the preparation of deeds for the purpose of having conveyed Marbold's lands, and about once a week or at least once every ten days throughout the summer of 1927 Pond conferred with Holbrook about the management of Marbold's properties. He took up with him the matter of disposing of and selling large amounts of implements, cattle, horses and other chattels, and advised with him generally concerning the handling of Marbold's property. He deposited money in and opened an account with the Marine Bank at the suggestion of Holbrook because of Holbrook's statement that it was the largest interested creditor. These conferences in regard to the management and handling of Marbold's property by the appellee Pond continued throughout the year 1927 and throughout 1928. Pond had repeated conversations with Holbrook as to moneys he was collecting from sales made by him and the expenses he was incurring and which were necessary; they discussed the place of deposit of said money and all

this was subsequent to the conversation had between Holbrook and Pond when Pond informed Holbrook he would be unable to secure all of the signatures of the creditors, and when Holbrook told him to go ahead and that they would go along with him.

During the years 1927, 1928 and more than one-half of 1929, the Marine Bank at no time, by word or manner, indicated that it was not abiding by and was one of the parties to the trust agreement. On the contrary, all of its acts, conferences and conduct were the acts and conduct and statements of one directly affected by the trust agreement and participating therein. In July or August, 1929, the first intimation was given by the Marine Bank to Pond that the bank intended to attempt to enforce its rights under the mortgage. More than two years and three months elapsed between the initiation of this creditors' plan and the time when the Marine Bank first indicated that it expected to rely upon the mortgages in this case. Holbrook testifies that his conversation with Pond in which he intimated that the bank was not going along with the trust, occurred in November, 1928. Immediately upon the closing of the bank the auditor of public accounts, through his representative, Weber, took charge of it.

Before the first meeting of the creditors, as Pond testifies, although Holbrook places it after the second meeting of creditors on about April 15, 1927, Pond discussed with Holbrook 'a bank balance of Frank Marbold's with the Marbold State Bank of about $11,000 and $6,500 worth of C. I. P. S. Company stock, which had been taken charge of by the auditor of public accounts, and at the same time he also discussed with Holbrook the deed which had been made by Marbold to the Marbold State Bank for the bank building in Greenview. The trust deed was executed March 11, 1927. The Marbold Bank had closed March 7, 1927, when the

auditor of public accounts took possession. He claimed and took the deposit of B. F. Marbold and this C. I. P. S. Company stock. Whether the stock was up as collateral or not is not shown. These facts the Marine Bank knew before Pond entered the matter.

Appellant states that the Marbold Bank secured three preferences: first, a trust deed given to Harry Matthews for its benefit for $100,000. While such a trust deed was executed prior to the time of the execution of the trust agreement and the Marine Bank knew all about it, Matthews said he does not know the purpose of it and that no notes were ever received by him or by the Greenview State Bank or the Marbold State Bank. At first he was not certain whether he ever saw the notes secured by this trust deed to him but thought that at one time the note was in the hands of Mr. Waldmire. Later, however, he said he was not sure whether he ever saw the note. At that time the indebtedness of Marbold to appellant bank was approximately $60,000 and no credit or record was ever made on the books of the bank, either the Marbold State Bank or the Greenview State Bank, with reference to this $100,000 trust deed.

The second preference mentioned by appellant is that a deed was made by Marbold to the Greenview State Bank for the bank building and property at Greenview, and his account in that bank credited with $25,000. This deed was recorded in Menard county March 24, 1927, and was not produced in evidence. The entire situation with reference to the transfer of this property to the bank by Marbold was fully discussed with Holbrook, the vice president of appellant, and by Mr. Pond about April 15, 1927. It was also explained to the creditors at their first meeting and they were informed of the deed which had been made by Marbold to the Marbold State Bank. It was thoroughly discussed by the various creditors who be-

lieved that it was the best thing to do under the circumstances.

Holbrook's complaint was that it was a violation of the gentlemen's agreement between the Marbold Bank and his bank. Pond told Holbrook that in his opinion it was advantageous to the creditors because Mrs. Marbold had released her dower interest in the building. In such discussions it was said that the allowance of credit of $25,000 by the Marbold Bank was advantageous to the other creditors because the building would not sell for more than $5,000 if the trustee had to sell it, and that Mrs. Marbold would have, in addition to that, her dower right. After Pond had told Holbrook his views in this connection, which was a day or two before the first meeting of the creditors, he at first was disgruntled. Nevertheless, he then told Pond to go ahead and he would go along with him, saying that he did not believe that the Marbold Bank had treated the Marine Bank fairly.

The third point of preference was the appropriation of the bank balance of some $11,000 and the C. I. P. S. Company stock by the auditor of public accounts.

On April 23, 1927, as soon as the deeds to the property of Marbold and the bills of sale for his personal property had been executed, and after the Marine Bank had been fully advised that all of the creditors of Marbold had not and would not sign the prepared trust arrangement, the appellee Pond, purporting to act as such trustee for the benefit of all of the creditors of Marbold, took possession of his properties and has been in possession, making leases, harvesting and marketing crops, selling implements and machinery, fertilizing the soil and selling horses and cattle belonging to B. F. Marbold. In all respects since that date until the present time he has dealt with these properties upon the theory that he was the trustee for the benefit of all of the creditors, upon a pro rata basis, excepting those creditors other than the Marine Bank and the

Marbold State Bank, who held mortgages executed before March 7, 1927, upon the properties.

The total indebtedness of Marbold amounted to about $444,000. There were from 65 to 70 creditors. Not counting appellant's indebtedness, over 80 per cent of the indebtedness was represented in the trust. Of those not signing the trust agreement, outside of appellant, there were only five or six creditors of whom it appears without dispute, that one William Austin is not yet definitely known to be a creditor; another, Bert Chamberlain, preferred to look to the surety on his note rather than to the trust estate of Marbold, and another, McLaughlin, denied she was a creditor of Marbold but claimed to be a creditor of the bank. The testimony shows that not one of the nonsigning creditors have ever interfered in any way with the trust. One Edwin S. Waldmire of Petersburg was very active in suggesting and attempting to first organize the trust. He consulted among the creditors but found they would not agree to select him as trustee. It is charged that he was acting for the appellant bank. Waldmire solicited Pond to go to Springfield and talk the matter out with Holbrook, which Pond did. Waldmire told Pond the bank (appellant) wanted to see him. Pond testifies that Holbrook at that meeting urged him very strongly to undertake the organization of the trust and gave him the incentive to go into it. At the various creditors' meetings the subject of attempting to throw Marbold's estate into bankruptcy was discussed and in view of appellant's mortgages for $100,000 they were only restrained by Pond's inducement to form the trust, and the pledge that appellant's bank would abandon its mortgages and come in and share pro rata with the creditors, which Pond was authorized by Holbrook to give to the creditors.

The appellant bank knew of the four months' provision of the bankruptcy law. It knew that the question of attempting to have B. F. Marbold declared

a bankrupt was discussed among the creditors. It knew that because of the representations of Pond this discussion stopped and no efforts were made by the creditors to have B. F. Marbold declared a bankrupt. It authorized Pond to make those representations, which were that it would not rely upon the mortgage sued upon, nor the $55,000 companion first mortgage executed at the same time, and it continued in that attitude of assurance to the creditors and to Pond until after rights of the creditors to have those mortgages declared preferential payments and set aside under the bankrupt law had been lost to them. It continued in this attitude for nearly two years after the expiration of that time.

There was a hearing before the master, who reported the evidence without his conclusions, and a hearing before the court upon the proofs taken and the court dismissed the bill for want of equity and complainant has appealed.

It is not disputed in this case but that appellant urged the organization of the trust and agreed to become a part of it if all the creditors signed, and the same was done within a reasonable time—about 90 days. There is a conflict in the testimony as to whether or not the bank, appellant, did not agree to go along with the trust anyway when Pond notified Holbrook that there were a few creditors whose signatures could not be obtained. The number not signing is so insignificant and it is so doubtful whether there were any bona fide creditors who did not sign the trust agreement, that taken together with the acts and conduct of the parties, renders the proof preponderating very strongly in favor of appellees that the trust agreement was agreed to by all of the creditors of Marbold, as contemplated in the conversations between Pond and Holbrook, and we so find.

Appellant contends that preferences were shown, as herein set out, which invalidates the trust, if it is

shown that appellant agreed to go into it. As to the $100,000 mortgage made by Marbold to Matthews, the proofs do not show how or for what purpose this mortgage was made. There is no testimony in this record tending to show that it was ever delivered to any person. The only disposition of it is indicated by the witness Harry J. Wernsing, president of the new, reorganized Greenview State Bank. He testifies: "I have not seen the notes but I am told they are in the State's Auditor's office. I could not tell you how long they have been there. I was told by Mr. Sorling that prior to that time they were in safekeeping at the Marine Bank (appellant). Mr. Sorling is trust officer of the Marine Bank. They were never in the possession of the Marine Bank." Appellant has not seen fit to give the court the history of the connection of its trust department with these securities. As to the bank building and its conveyance to the newly organized bank in Greenview at a consideration of $25,000 allowed upon Marbold's indebtedness to the bank, which was $60,000, it is nowhere shown in this record that this arrangement was a preference or other than a profit to the creditors. Under the trust agreement, Mrs. Marbold was entitled to one-fourth interest in this real estate as dower, and from this record it is impossible to determine that the transaction was not of financial profit to the creditors. As to the item of Marbold's deposit in the old bank of $11,000 and the C. I. P. S. Company stock, as a part of the Marbold Bank, of course when the bank closed its doors there was no deposit belonging to Marbold and it all became a part of the bank's assets and was taken in charge by the State auditor to secure the depositors. Nothing as to the settlement of the affairs of the Marbold State Bank and the reorganization of the Greenview State Bank has been brought into this record and we are unable to determine anything as to these transactions. It is sufficient to say that no preference is shown in

this transaction and no preferences are shown in connection with this trust.

Appellant argues that this transaction constitutes a novation and the burden of proof is upon appellees, which must be clear and convincing. Novation is a mode of extinguishing one obligation by another. 20 R. C. L. 259, sec. 1, note 1. Parsons defines novation as a transaction whereby a debtor is discharged from his liability to his original creditor by contracting a new obligation in favor of a new creditor by order of his original creditor. 1 Parsons on Contracts, 5th ed., 217. No novation is disclosed by the evidence in this case and no contention is made by appellee that there was novation, for the following reasons: (1) The existing indebtedness of Marbold was not satisfied but still exists; (2) The creditor's agreement was discussed by Marbold with the Marine Bank prior to and at the time of the execution of the notes executed at the bank's suggestion; (3) The creditor's agreement is merely the carrying out of the agreement between Marbold and the bank that such an arrangement should be made; (4) The bank did not release its debt, but for a valuable consideration merely agreed to waive the purported security given by the mortgage lien. But appellant insists its mortgage is a valid and subsisting lien because it never signed the trust agreement. Where one has been induced to act or to refrain from action by the course of conduct of another, so that he will be substantially injured if such other be allowed to repudiate such course of conduct, an estoppel arises. (*Adam v. Columbian Nat. Life Ins. Co.,* 218 Ill. App. 54; *Hawley v. Florsheim,* 44 Ill. App. 320.)

The position of the creditors, other than the Marine Bank, is materially changed and their recovery materially lessened through the failure to file involuntary bankruptcy proceedings against Marbold or

through Marbold's failure to voluntarily go into bankruptcy, in the event that the Marine Bank is permitted to foreclose its mortgage. So, in reliance upon the participation by the Marine Bank, upon a basis equally with them, their rights would be lost if the bank were permitted to assert its lien under the mortgage and under such circumstances, in view of the facts in this case, an estoppel will arise against the Marine Bank. (*Powers v. Wells,* 244 Ill. 558; *DeProft v. Heydecker,* 297 Ill. 541; *Walls v. Ritter,* 180 Ill. 616; *Burke v. Grant,* 116 Ill. 124; *Ball v. Hooten,* 85 Ill. 159; *Colwell v. Brower,* 75 Ill. 516; *Kinnear v. Mackey,* 85 Ill. 96.) Estoppel may arise from silence as well as from words. (*Oliver v. Ross,* 289 Ill. 624; *Lloyd v. Lee,* 45 Ill. 277; *Vail v. Northwestern Mut. Life Ins. Co.,* 192 Ill. 567.) One who has actively co-operated with others in a particular manner, will not thereafter be heard to assert an inconsistent right. (*Oliver v. Oliver,* 179 Ill. 9.) A creditor who has full knowledge of the making of an assignment for the benefit of all creditors and acquiesces therein, is bound by the assignment and cannot attack it. (*Scheltes v. Hunter,* 195 Ill. App. 213; *Imperial Woolen Co. v. Longbottom,* 143 Fed. 483; 5 C. J., 1065, sec. 41; sec. 42, par. 4.)

In *Oliver v. Oliver, supra,* the court held: "Even if the decree was erroneous appellant could not be heard to complain, inasmuch as it was an error that he asked the court to commit. In his answer and intervening petition he alleged it was a trust estate or fund in the hands of the court, and could not be divided by bill for partition. When this view so urged upon the court was adopted and the sale ordered appellant changed his position, and now assigns for error here that the court did not proceed in accordance with the Partition Act. This he cannot be permitted to do. *Smith v. Kimball,* 128 Ill. 583; *Cronk v. Trumble,* 66 id. 428." In *Oliver v. Ross, supra,* it was held: "The

party who challenges the title of his adversary to real property must be diligent in discovering that which will avoid the title and render it invalid and diligent in his application for relief. Unreasonable delay in explaining by equitable circumstances has always been declared evidence of acquiescence and will bar relief. (*Howe v. South Park Com'rs,* 119 Ill. 101.) While the chancellor erred in holding that this deed was a forgery, yet he did not err in holding that Flora Oliver was estopped from asserting her rights in this land.''

In *DeProft v. Heydecker, supra,* the court held: ''It is only when the delay is accompanied by some act done or permitted, some change of relations or conditions, or some other element rendering it inequitable to permit the owner to assert his title, that laches will bar his right within the statutory period. *Compton v. Johnson,* 240 Ill. 621; *Hutson v. Wood,* 263 id. 376; *Lynn v. Worthington,* 266 id. 414; *Stowell v. Lynch,* 269 id. 437.'' In Corpus Juris, *supra,* vol. 5, page 1065, it is held: ''It seems that any act, conduct, or declaration on the part of a creditor, indicating that he has consented to the assignment made for his benefit, will constitute a sufficient acceptance. (*Beach v. Bestor,* 45 Ill. 341); and it has been repeatedly held that it is not necessary that he should sign the instrument of assignment, or that his consent should appear upon the face of the assignment.''

By appellant's conduct and express agreements, the creditors of Marbold were prevented from presenting to a bankruptcy court the issue of the preference of appellant's mortgage and at a time when appellant believed Marbold was insolvent, about which there can be no question.

For the reasons stated, the decree of the circuit court is affirmed.

*Affirmed.*

Upon Petition for Rehearing

It is not a novation because no new obligation was made, but all creditors agreed to be satisfied with the application of the debtors' estate to their present claims. *Potter v. Fitchburg Steam Engine Co.,* 110 Ill. App. 430, is cited, but in that case numerous bond-holders under the mortgage were not notified and had no knowledge of the transaction. It is objected that Pond's trust deed, made March 27, 1927, of the debtors' estate, is made subject to appellant's mortgage of March 9, 1927, both of the instruments having been executed after the bank failed and Marbold became insolvent. The mortgages were not made to appellant, but were made to one Bernard for no consideration. There had been negotiations with Bernard about a loan. It was not completed when Marbold failed. Appellant made use of the same instruments in an attempt to secure its own debt after it was known that Marbold was insolvent. Appellant's attorneys drew Pond's trust deed for him on March 27 following, in the attempt to form the trust and at its inception it was discussed that the mortgages might become a deterrent to Marbold's bankruptcy. Appellant now seeks to argue upon some facts presented that Marbold and his estate were not subject to the bankruptcy court. Those facts and that question are not before this court at this time. The record shows that many of the creditors feared Marbold or some of his creditors would press bankruptcy in the spring of 1927.

There were some contradictions between Pond and Holbrook as to just what took place between them, but nothing, in our view of this case, that would furnish a ground for rehearing or affect the merits of the case. Accordingly, the opinion is modified and petition for rehearing denied.